## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

**DANIEL DIAMANT,**
    *Plaintiff*

**v.**                                            **C.A. No. 1:17-cv-00548-MSM-PAS**

**UTGR, INC. d/b/a Twin River Casino,** *et al.*,
    *Defendants*

## STATE'S MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Rhode Island State Police Corporal Lawens Fevrier, in his official capacity ("Corporal Fevrier" or "the State") hereby files this Memorandum of Law in support of the Motion for Summary Judgment. Plaintiff Daniel Diamante (hereinafter "Plaintiff" or "Diamant") brings this four (4) count Amended Complaint alleging: (1) false imprisonment; (2) intentional infliction of emotional distress; (3) Fourth Amendment unreasonable search and seizure; and (4) vicariously liability arising out of his gambling trip to Twin River Casino on July 2, 2016.  The First Amended Complaint is brought against: UTGR, Inc. dba Twin River Casino and John Does, various security personnel employed by Twin River Casino; Joseph Anterni and Russel Enos, police officers employed by the Town of Lincoln[1] and Corporal Fevrier in his official and individual capacities.  The United States Supreme Court precedent of *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989), the Eleventh Amendment, the doctrine of qualified immunity and the Amended Complaint's failure to state viable causes of action compel the dismissal of the State defendant Corporal Fevrier.

---

[1] The original Complaint referred to the Town police officers as John Doe Defendants.  The Town has moved for summary judgment. *See* ECF 31.

## I.    Factual Background

### A.   Rhode Island State Police Gaming Enforcement Unit

In 2013 the Rhode Island General Assembly enacted R.I. Gen. Laws § 42-61.3-1 directing the superintendent of the Rhode Island State Police ("RISP") to establish the "Gaming Enforcement Unit" ("GEU").  The GEU works "independently and in conjunction and cooperation with the division of state lottery and the department of business regulation to ensure the integrity of casino gaming activities in the state."  R.I. Gen. Laws § 42-61.3-1(b).  The GEU's statutorily enumerated duties include, but are not limited to: "(1) [c]onducting due diligence investigations and background investigations with respect to entities and individuals required to be licensed by the division and/or the department of business regulation; (2) [m]onitoring for and investigating potential criminal activity; and (3) taking any and all actions necessary to enforce the criminal laws related to casino gaming activities."  R.I. Gen. Laws § 42-61.3-1(d).  Additionally, by statute, the GEU:

> shall have the power to enter the premises of a gaming facility licensed by the division of state lottery at any time, to the extent permissible under the constitutions of the state of Rhode Island and the United States of America, through its investigators and law enforcement personnel at any time without notice for the following purposes:
>
> (1) To inspect and examine the premises of a gaming facility where casino gaming activities are conducted;
>
> (2) To inspect, examine and/or seize any and all tangible property related to casino gaming activities;
>
> (3) To inspect, examine, seize and/or audit all computers, books, ledgers, documents, writing, photocopies, correspondence, records, videotapes, including electronically stored records, money receptacles, other containers and their contents, and equipment in or on which the records are stored at a licensed gaming facility, its parking areas and/or adjacent buildings and structures on the premises of the gaming facility;
>
> (4) To conduct criminal investigations into violations of the criminal laws or the rules and regulations promulgated thereto;

2

(5) To eject, exclude or authorize the ejection or exclusion of a person from a gaming facility if the person allegedly violated any criminal law, or when the division of state lottery or the casino gaming unit determines that the person's conduct or reputation is such that his or her presence within the gaming facility may compromise the honesty and integrity of casino gaming activities or interfere with the orderly conduct of casino gaming activities. Nothing herein shall preclude any other law enforcement or regulatory agency from having similar authority as otherwise permitted by law or regulation; and

(6) Take any and all other actions as may be reasonable or appropriate to carry out their duties and responsibilities under this chapter.

R.I. Gen. Laws § 42-61.3-1(g).

On July 2, 2016, Corporal Lawens Fevrier was a member of the RISP GEU.

**B.  July 2, 2016**

With the consent of the Town of Lincoln, the State herein incorporates the Town's recitation of the "factual background" and further elaborates on Corporal Fevrier's involvement on July 2, 2016.

"On the evening of July 2, 2016, Plaintiff was playing blackjack at Twin River Casino in Lincoln, Rhode Island, when he was approached by Twin River Security Captain James Kyle ("Captain Kyle") and several security guards.  Exhibit A, Dec. 7, 2018 Dep. Tr. of Dan Diamant at 35:17-22.[2]  Twin River Security had received a communication from Foxwoods Casino, with Plaintiff's name and date of birth, indicating that Plaintiff was a card counter[3] and thus a "confirmed advantage player."[4]   Exhibit B, Mar. 18, 2019 Dep. Tr. of James Kyle, III at 14:22-

---

[2] In accordance with Rule 56, the facts are viewed in the light most favorable to Plaintiff. Defendant's recitation of these facts herein do not represent agreement with the same.

[3] Card counting is a card game strategy, used primarily in blackjack, whereby a player keeps a running tally of all high and low valued cards seen by the player to gain an advantage based on the composition of remaining cards.

[4] An "advantage player" is particularly observant and skillful in playing certain casino games so that he gains a mathematical advantage over the casino.

24; 15:6-8.  Captain Kyle approached Plaintiff, asked him to step away from the blackjack table, and advised him that he was going to be permanently ejected from the casino because he was an advantage player.[5]  *Id.* at 15:10-20.  Captain Kyle then asked Plaintiff to produce identification so that he could complete an ejection form; Plaintiff refused.  *Id.* at 15:21-24; 16:4-5.  Pursuant to the Twin River security department's ejection procedure, Captain Kyle requested the assistance of the Lincoln Police to witness the ejection.  *Id.* at 16:1-3.  The Twin River surveillance department also contacted the on-call detective from the Rhode Island State Police, Gaming Enforcement Division, Corporal Fevrier and advised him that they had an individual on the floor who they believed to be counting cards, had been ejected from Foxwoods the prior night as a confirmed advantage player, but was refusing to produce identification to complete their intended ejection notice.[6]  *Id.* at 16:11-14."  Corporal Fevrier understood card counting to compromise the integrity and fairness of blackjack.  Exhibit C, Jan. 16, 2019 Dep. Tr. of Lawens Fevrier at 13:18-24, 60:19-22.  "Twin River provided Corporal Fevrier with the presumed name and date of birth of Plaintiff from the Foxwoods correspondence.  *Id.* at 29:22-24.  Corporal Fevrier had Plaintiff's presumed name and date of birth run through the state control but the results came back "negative."  *Id.* at 30:2-7.  According to Corporal Fevrier, this means that the person did not exist in the United States.  *Id.*"  Because he received a call from Twin River of a gaming matter, Corporal Fevrier presented himself at the Casino so he could sign the ejection notice.  *Id.* at 71:19-24, 72: 1-6.[7]  There is no evidence

---

[5] Although card counting is not illegal, casinos typically ban patrons for counting cards.  R.I. Gen. Laws § 41-3-17 affords casinos discretion to "refuse admission to and to eject from" the casino any person whose presence is "undesirable."

[6] The Rhode Island Lottery requires that any suspected gaming infraction be reported to the Rhode Island State Police for investigation.  *See* R.I. Lottery Rules and Regs., § 20.11 C (2019).

[7] Corporal Fevrier testified that "[b]ased on what they have going on at times, when Twin River security wanted to eject someone, Lincoln Police can actually sign it or any law enforcement can

that the Twin River security informed Corporal Fevrier during the call that Plaintiff indicated that he asked to leave the casino.

"Meanwhile, the two LPD Officers working the police detail at Twin River that night, Officer Joseph Anterni ("Officer Anterni") and Officer Russell Enos ("Officer Enos"), received a call from Twin River Security to investigate a report of a "non compliant patron" at the table games near the casino's West Entrance.  Exhibit D, Police Dept. Narrative, 1.  Upon their arrival at the scene, the LPD Officers found Plaintiff standing with Twin River security guards.  Exhibit E, Dec. 12, 2018 Dep. Tr. of Joseph Anterni at 26:5-8.  Before the LPD Officers could speak with Twin River security personnel and determine why they had been called, Plaintiff told Officer Anterni that he wanted to leave the casino and asked Officer Anterni if he was being accused of a crime and whether he was free to leave.  *Id.* at 26: 9-10; Diamant Dep. Tr. at 41:7-8.  Officer Anterni informed Plaintiff that he did not know because he was unaware of what Plaintiff was accused of and told him to "hold on" (or something to that effect) while he spoke to Captain Kyle.  Anterni Dep. Tr. at 26:21-23, 38:22-24; Diamant Dep. Tr. at 42:1-5.  Plaintiff claims that he responded that he wanted to leave and asserts that Officer Anterni replied, "if you try to leave, I have to stop you."  Diamant Dep. Tr. at 42:9-10.  Officers Anterni and Enos then spoke with Captain Kyle, who informed them that Plaintiff was counting cards, refused to identify himself for the ejection notice and that security had called the State Police who wanted to speak with him.  Anterni Dep. Tr. at 27:6-10.  Officer Anterni relayed this information to Plaintiff, who again asked whether he

---

sign it. So, they don't need me there to sign it." *Id*. at 71:23-24, 72:01-72:03. However, "[i]f it's a gaming related where the trooper or detective is called and the trooper responds or detectives respond to the case, then he would be the only one to sign it." *Id.* at 72:11-14.  With respect to the present case, Fevrier explained, "[i]t was my decision to go.  They didn't need me to go back there based on the circumstances.  Based on the facts that they had, then I wanted to make sure that I had the right information to write on the ejection notice." *Id*. at 72:21-73:01.

was free to leave.  *Id.* at 27:19-24, 28:1-2.  At this point, Officer Anterni told Plaintiff that he would not stop Plaintiff from leaving.  *Id.* at 28:3-4.  According to Plaintiff, the Lincoln Police officers basically just stood there.  Diamant Dep. Tr. at 40:13-14, 41:2-3.  At one point, Officer Anterni explained to Plaintiff that Twin River Security wanted to issue Plaintiff an ejection notice in a private interview room equipped with a surveillance camera, and reassured Plaintiff that nothing bad would happen to him.  Anterni Dep. Tr. at 27:19-24, 29:11-24.  After some initial hesitation, Plaintiff agreed to go to the interview room with Twin River security, but asked Officer Anterni to accompany him.  Diamant Dep. Tr. at 48:4-11.  Officer Anterni agreed to do so and went with Plaintiff and Twin River security personnel to the interview room.  *Id.* 48:22-24, 49:1-2.”

A short time later, Corporal Fevrier arrived.  He entered the room, his badge visible around his neck as he was in plain clothes, introduced himself to Plaintiff as the gaming enforcement detective on duty, and explained to Plaintiff why he was there.  Fevrier Dep. Tr. at 38:5.  During a pat-down,[8] which he did for officer safety[9], Corporal Fevrier felt something unusual at Plaintiff's waist.  *Id.*  50: 21-24, 51:1-3,16-17, 55:5-10.  Fevrier quickly removed a waist wallet/fanny pack for his safety.  *Id.*  Not being sure whether the waist wallet contained a weapon, Corporal Fevrier opened it.  *Id. at 53:16-21.*  He discovered Plaintiff's identification showing that Plaintiff was an

---

[8] “Corporal Fevrier testified that he asked Plaintiff if he minded if the Corporal patted him down for his own safety and Plaintiff merely stood up without saying anything.  Fevrier Dep. Tr. at 52. Plaintiff testified that Corporal Fevrier told him to stand up because he was going to search him. Diamant Dep. Tr. at 50-51.

[9] Corporal Fevrier was in an extremely small room; when he gave state control the name Dan Diamant and a date of birth nothing came back as if the person didn't exist, and he has encountered patrons with pocket knives at Twin River.  Given the totality of the circumstances combined with Corporal Fevrier's duties under R.I. Gen. Laws §42-61.3-1(g), a pat-down for officer safety was appropriate. *See* Fevrier Dep. Tr. 35:13-14, 49:13-24; Affidavit of Lawens Fevrier, attached hereto as Exhibit G**.**

Israeli citizen. Based on this information, Corporal Fevrier understood why the initial search of Plaintiff's name through state control produced negative results. Fevrier Dep. Tr. at 55:13-17.  He called state control and asked them to run Plaintiff through Interpol to make sure that Plaintiff was not wanted by another country.  *Id*. at 55:13-23.  Thereafter, Corporal Fevrier witnessed the permanent ejection notice issued to Plaintiff by Twin Rivers. *See id.* at 50-54. Corporal Fevrier described Plaintiff's demeanor during their exchange as calm and not talkative.  *Id*. at 66:1-3. "Plaintiff was then escorted to the exit by a Twin River security guard.  Diamant Dep. Tr. at 55:4-7.  The entirety of the interaction between the LPD Officers and Plaintiff lasted approximately ten minutes.  Anterni Dep. Tr. at 40:8-10.  The entirety of Corporal Fevrier's interaction with Plaintiff lasted a half an hour by Diamant's estimate and Diamant Dep. Tr. at 50:17-18."

## II.    STANDARD OF REVIEW

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. Id. But, in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

"Although [this Court] will draw all reasonable inferences in the nonmovant's favor, [this Court] will not 'draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective.'" *Garmon v. National Railroad Passenger Corp.*, 844 F.3d 307, 312 (1st Cir. 2016).  "[A] party cannot successfully oppose a motion for summary judgment by

resting 'upon mere allegations or denials of his pleading.'" *Id.* Rather, "a plaintiff's ability to survive summary judgment depends on his ability to muster facts sufficient to support an inference of discrimination." *Id.* at 313.

### III.   ARGUMENT

**A. Plaintiff's Constitutional Claim Set Forth at Count III of the Amended Complaint Fails as a Matter of Law as Dictated by *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)**

Plaintiff alleges in Count Three of the Amended Complaint that "[t]he defendants, jointly and severally, unlawfully detained, searched and seized Mr. Diamant under color of law, thereby depriving him of his rights under the Fourth Amendment of the United States Constitution" and "seeks monetary damages pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, and Article I, §§ 2, 5, 6, and 14 of the Rhode Island Constitution, Rhode Island General Laws § 10-7-1, et seq.,[10] and under the common law of the State of Rhode Island." Amended Compl., ECF 36 at ¶¶ 1, 43. Only in the Amended Complaint did Plaintiff allege that "Trooper Fevrier is being sued in his official and individual capacity." Amended Compl., ECF 36 at ¶ 7.

Much like serving a federal employee,[11] in proceedings where an employee of the State of Rhode Island is sued officially and individually, the two distinct capacities require separate service—once on the Office of the Rhode Island Attorney General for the employee's official

---

[10] It is unclear the basis for which Plaintiff seeks monetary damages under the Rhode Island Wrongful Death Act, R.I. Gen. Laws § 10-7-1, *et seq.* Plaintiff is not deceased, and even if he were, Plaintiff could not seek damages in his own name or the name of his estate. *See* R.I. Gen. Laws §§ 10-7-2 and 10-7-10.

[11] "To serve a United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf (whether or not the officer or employee is also sued in an official capacity), a party must serve the United States and also serve the officer or employee under Rule 4(e), (f), or (g)." Fed. R. Civ. P. 4(i)(3).

capacity, under Fed. R. Civ. P. 4(j) and R.I. Gen. Laws § 42-9-6, and once again upon the person

for their individual capacity, under Fed. R. Civ. P. 4(e), (f), or (g). Under Rule 4(j), a state must

be served by delivering a copy of the summons and complaint "in the manner prescribed by that

state's law for serving a summons or like process on such a defendant." Fed. R. Civ. P. 4(j)(2).

Under Rhode Island law, "Service shall be made … [u]pon the state by furnishing a copy of the

summons, complaint, Language Assistance Notice, and all other required documents to the

attorney general or an assistant attorney general." R.I. Super. Ct. R. Civ. P. 4(e)(4); see also Farb

v. Perez-Riera, 293 F.R.D. 77, 79 (D.P.R. 2013) ("Even if a defendant is served pursuant to a state

law method of service, the federal forms of summons must be used."). The Attorney General is

authorized to accept service on behalf of the State of Rhode Island and State employees in their

official capacities. *See* R.I. Gen. Laws § 42-9-6 ("[T]he attorney general, whenever requested, …

shall appear for and defend the above-named individual legislators, boards, divisions, departments,

commissions, commissioners, and officers, in all suits and proceedings which may be brought

against them in their *official capacity*.") (*emphasis added*); *see also Danny B. ex rel. Elliott v.*

*Raimondo*, 784 F.3d 825, 834 (1st Cir. 2015) (Noting that a suit against a state officer in their

official capacity is the functional equivalent of a suit against the State and not the officer).

    In the instant matter, Assistant Attorney General Michael Field accepted service of the

Complaint, ECF 1, on behalf of Corporal Fevrier in his official capacity only; a distinction that

was made expressly clear when service was accepted. See Proof of Service, ECF 12. Moreover,

the Complaint made no mention of the capacity in which Corporal Fevrier was being sued. *See*

Compl, ECF 1 at ¶ 7. It was not until Plaintiff filed the Amended Complaint did Plaintiff allege

that "Trooper Fevrier is being sued in his official capacity and individual capacity." Amended

Compl., ECF 36 at ¶ 7. Plaintiff's Amended Complaint effectively added Corporal Fevrier,

personally, as a Defendant, asserting the same claims Plaintiff contemporaneously asserted against the State. *See Danny B. ex rel. Elliott v. Raimondo*, 784 F.3d 825, 834 (1st Cir. 2015). However, despite adding Corporal Fevrier in his individual capacity as a Defendant, Plaintiff did not serve Corporal Fevrier in his individual capacity with the Amended Complaint, as required by Rule 4 when adding claims or defendants. *See* Proof of Service, ECF 12.

Plaintiff is well past the ninety (90) day time limit for service and the three (3) year statute of limitations for § 1983 actions. *See* Fed R. Civ. P. 4(m); *Wilson v. Garcia*, 471 U.S. 261, 280 (1985); *Martinez-Rivera v. Commonwealth of Puerto Rico*, 812 F.3d 69, 74 (1st Cir. 2016) ("Because section 1983 does not have its own statute of limitations … courts use the personal-injury limitations period adopted by the state where the injury supposedly occurred…."); *see also* R.I. Gen. Laws § 9-1-14(b) ("Actions for injuries to the person shall be commenced and sued within three (3) years next after the cause of action shall accrue…"); *see also e.g., Paul v. City of Woonsocket*, 745 A.2d 169, 172 (R.I. 2000) ("The appropriate residual statute for personal injury claims is § 9–1–14(b)"). As such, because Plaintiff failed to serve Corporal Fevrier in his individual capacity, and the statute of limitations has expired with respect to those claims, Plaintiff may pursue claims against Corporal Fevrier in his official capacity only.

Plaintiff's constitutional claims against Corporal Fevrier in his official capacity fail as a matter of law. *See* Amended Compl., ECF 36 at ¶¶ 42-46; *contra Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Plaintiff's claims against Corporal Fevrier in his official capacity are the functional equivalent of a suit against the sovereign. *Danny B. ex rel. Elliott v. Raimondo*, 784 F.3d 825, 834 (1st Cir. 2015). And thus, Plaintiff's claims against the State fall outside the ambit of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that states are not "persons" within the meaning of § 1983); *see also Danny B. ex rel. Elliott v. Raimondo*,

784 F.3d 825, 834 (1st Cir. 2015) (acknowledging the unavailability of money damages against the State in a § 1983 class action against the Governor of Rhode Island and other official capacity-only state defendants). Under § 1983:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (*emphasis added*). In *Will v. Michigan*, The Supreme Court solidified the principle that plaintiffs may not maintain § 1983 claims against a state, because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." 491 U.S. at 71. In reaching its decision, the Court first noted that "'in common usage, the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it.'" Id. at 64 (citations omitted). Furthermore, the Court observed that the language of § 1983 "falls far short of satisfying the ordinary rule of statutory construction that if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Id.* at 65 (citations omitted). Finally, in attempting to decipher congressional intent as to the scope of § 1983, the Court concluded that Congress did not intend for § 1983 to provide a federal forum for litigants seeking a remedy against a State for alleged deprivations of civil liberties. *Id.* at 70–71. Likewise, in *Jones v. State of Rhode Island*, the First Circuit applied the Supreme Court's holding in *Will,* and held that "neither the State of Rhode Island nor any of its officials acting in their official capacities, are 'persons' that can be held liable under § 1983." 724 F. Supp. 25, 28 (1st Cir. 1989); *see also Danny*

*B. ex rel. Elliott*, 784 F.3d at 834.

**B.  If Suit Were to Proceed Against Corporal Fevrier in his Individual Capacity, Qualified Immunity Would Nevertheless Compel Dismissal**

Alternatively, should this Honorable Court permit Plaintiff to proceed against Corporal Fevrier in his individual capacity, in lieu of deficient service and the expiration of the statute of limitations, Corporal Fevrier is nonetheless protected by qualified immunity.

"The doctrine of qualified immunity offers public officials a defense against liability under 42 U.S.C. § 1983." *Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664, 666 (1st Cir. 1996). "The qualified immunity defense exists not only to shield officials from liability for damages, but also to protect them from 'the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Qualified immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Bilida v. McCleod*, 211 F.3d 166, 174 (1st Cir. 2000).    Importantly, "because '[t]he entitlement is an *immunity from suit* rather than a mere defense to liability,' *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (emphasis in original).

The invocation of qualified immunity rests on the following analysis:

"[A]n inquiring court must consider (i) whether the plaintiff's proffered version of the facts, if true, makes out a violation of a constitutionally protected right; (ii) if so, whether that right was clearly established at the time of the putative violation;

and (iii) if the answers to the preceding two queries are affirmative, whether a reasonable public official, situated similarly to the defendant, should have understood the challenged act or omission to violate the discerned right." *Morelli v. Webster*, 552 F.3d 12, 18 (1st Cir. 2009).

Crucially, "[a] single negative answer to any one of the three inquiries is sufficient to shield Defendants against Plaintiffs' claims under the protective cloak of qualified immunity." *J.R. v. Gloria*, 599 F. Supp. 2d 182, 193 (D.R.I. 2009).

Qualified immunity is more than a mere defense to liability, it provides defendant public officials with immunity from suit. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); see *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982) (recognizing that qualified immunity exists not only to shield officials from liability for damages, but also to protect from "the general costs of subjecting officials to the risks of trial…"). The doctrine of qualified immunity precludes suits for money damages against state officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The First Circuit employs a two-step analysis to determine whether a public official is entitled to qualified immunity. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) ("[W]e now adopt the Court's two-part test and abandon our previous usage of a three-step analysis."). When making an objective reasonableness determination, a court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

Furthermore, the second step has two aspects: (a) one focusing on the clarity of the law at the time of the alleged civil rights violation and (b) the other focusing more concretely on the facts of the particular case and whether a reasonable defendant would have understood that the conduct violated the plaintiff's constitutional rights. *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640

(1987)).

Police officers relying on state law to support their search and/or seizure have been entitled

to a "valid defense of good faith" and an entitlement to qualified immunity.  As the United States

Supreme Court explained in *Michigan v. DeFillippo*, 443 U.S. 31, 39 (1979):

> Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.
>
> In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), persons who had been arrested for violating a statute later declared unconstitutional by this Court sought damages for false arrest under state law and for violation of the Fourteenth Amendment under 42 U.S.C. § 1983. Mr. Chief Justice Warren speaking for the Court, in holding that police action based on a presumptively valid law was subject to a valid defense of good faith, observed: "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." 386 U.S., at 555, 87 S.Ct., at 1218. The Court held that "the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983." *Id*., at 557, 87 S.Ct., at 1219. Here, the police were not required to risk "being charged with dereliction of duty if [they did] not arrest when [they had] probable cause" on the basis of the conduct observed.

The relevant, dispositive inquiry in determining whether a right is clearly established[12] is

whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (*quoting Brosseau v. Haugen*, 543 U.S.

194, 199 (2004)). In other words, an officer's claim of qualified immunity will be defeated if, "in

---

[12] This Court should be mindful, in determining what law is "clearly established" for qualified immunity purposes, that the vast majority of state officers are not lawyers and rely on the relevant guidance of others in the conduct of their duties. They cannot be expected to be "seers in the crystal ball of constitutional doctrine" any more than "high state officials." *Westberry v. Fisher*, 309 F. Supp. 12, 17 (D. Me. 1970).

light of pre-existing law" the unlawfulness of the officer's conduct was "apparent." *See Anderson*, 483 U.S. at 640; *see also Bilida v. McCleod*, 211 F.3d 166, 174 (1st Cir. 2000) (noting that qualified immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law."); *DeAbadia v. Izquierdo Mova*, 792 F.2d 1187, 1193 (1st Cir. 1986) ("*Harlow* demands not prescience, but subjective good faith.").  While case law directly on point is not required to show that a right was "clearly established," " 'existing precedent must have placed the statutory or constitutional question beyond debate.' " *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)(citation omitted).  All in all, qualified immunity protects public officials who act in good faith when performing the discretionary functions of their job so long as they did not blatantly break the law.  *See Anderson*, 483 U.S. at 640.

Qualified immunity also applies to state law claims as well as federal constitutional claims. *See Hatch v. Town of Middletown*, 311 F.3d 83, 90 (1st Cir. 2002); *Hopkins v. Rhode Island*, 491 F.Supp 2d 266, 276 (D.R.I. 2007); *Ensy v. Culhane*, 727 A.2d 687 (R.I. 1999); *Pontbriand v. Sundlin*, 699 A.2d 856 (R.I. 1997).  Thus, Counts One, Two and Four of the Amended Complaint should also be dismissed.

**C. Corporal Fevrier is Entitled to Qualified Immunity on Plaintiff's Fourth Amendment Claim**

   ***i.   Corporal Fevrier Did Not Seize Plaintiff in Violation of the Fourth Amendment***

The Fourth Amendment protects "the right of the people to be secured in their persons, houses, papers, and effects, against unreasonable searches and seizures …" *United States v. Proctor*, 148 F.3d 39, 41 (1st Cir. 1998) (quoting U.S. Const. amend. IV).  "The primary purpose of the Fourth Amendment is ''to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'''" *United States v. Ford*, 548 F.3d 1, 4 (1st Cir. 2008).  That being said, not every interaction with the police is a seizure under the

Fourth Amendment.  *Ford*, 548 F.3d at 4.  The Supreme Court has declined to set a *per se* or bright-line rule on when a seizure occurs; explaining that one must look to the totality of the circumstances to determine where an encounter with law enforcement arises to the level of a seizure.  *United States v, Drayton*, 536 U.S. 194, 201 (2002); *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *Ford*, 548 F.3d 3-4.  Providing guidance, the Supreme Court in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) articulated that "'a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  *Ford*, 548 F.3d 4 (quoting *Mendenhall*, 466 U.S. at 554).   In viewing the circumstance, courts should apply an objective test; looking "not to 'whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'"  *Id*. at 5 (quoting *California v. Hodari D*., 499 U.S. 621, 628 (1991)).  In reaching its decision on whether a seizure has occurred, a court may consider factors such as whether the officer displayed a weapon, physical touching by the officers or did the officer's language or tone command obedience.  *Id*.  The Town of Lincoln directs this Honorable Court to specific cases wherein federal courts have analyzed police encounters through an objective lens in determining whether a Fourth Amendment seizure occurred; which the State incorporates by reference ECF Doc. 31-1, at page 13, as if fully set forth herein.

Corporal Fevrier's actions were lawful and, at the very least he would be entitled to qualified immunity, for any seizure of Plaintiff that occurred on July 2, 2016.  When Corporal Fevrier was contacted by Twin River Security, he was advised that they had an individual on the floor who they believed to be counting cards, had been ejected from Foxwoods the prior night as a confirmed advantage player, but was refusing to produce identification to complete their intended

ejection notice. *Id.* at 16:11-14." Based on his training, Corporal Fevrier understood card counting

to compromise the integrity and fairness of blackjack. Exhibit C, Jan. 16, 2019 Dep. Tr. of Lawens

Fevrier at 13:18-24, 60:19-22. And when Corporal Fevrier ran Plaintiff's presumed name and

date of birth through the state control but the results came back "negative." *Id.* at 30:2-7. To

Corporal Fevrier this meant that the person did not exist in the United States. *Id.* While checking

state controls, it was Corporal Fevrier understanding that Plaintiff was speaking with the Town of

Lincoln and Twin River Security. *Id*. 32:3-8. There is no evidence that the Twin River security

informed Corporal Fevrier during the call that Plaintiff asked to leave the casino.

Because he received a call from Twin River on a gaming matter, Corporal Fevrier presented

himself at the Casino so he could sign the ejection notice. *Id*. at 71:19-24, 72: 1-6. As a member

of the RISP GEU, Corporal Fevrier was acting consistent with and under the parameters of R.I.

Gen. Laws § 42-61.3-1(g) and was traveling to Twin River to place his name on the ejection notice

issued by Twin River. Upon his arrival at the casino, Corporal Fevrier's interaction with Plaintiff

was consistent with and under the parameters of R.I. Gen. Laws § 42-61.3-1(g) in that he intended

to obtain Plaintiff's name so that he could make sure it was correctly placed on an ejection notice

as authorized by R.I. Gen. Laws § 42-61.3-1(g)(5); taking reasonable measures to confirm

Plaintiff's identity to ensure the accuracy of the ejection notice. *See* R.I. Gen. Laws § 42-61.3-

1(g)(6). Corporal Fevrier's actions *vis a vis* Plaintiff were consistent with Rhode Island law and

did not constitute an impermissible Fourth Amendment seizure[13].

---

[13] The State further concurs and joins with the Town of Lincoln's argument at ECF No. 31-1 at pp. 17-18, that Corporal Fevrier had reasonable suspicion to a temporary detainment of Plaintiff given the totality of the circumstance: his understanding that Plaintiff had been ejected from Foxwoods the prior night for card counting, that his purported name and date of birth provided by Foxwoods did not appear when run in state control as if Plaintiff did not exist and his steadfast refusal to provide any confirming identification.

Assuming *arguendo* that this Honorable Court determines that a seizure occurred, and it was not privileged, Corporal Fevrier should nevertheless be entitled to qualified immunity as a bar to this suit.  In doing so, the State submits that Corporal Fevrier relied on a valid Rhode Island law, R.I. Gen. Laws § 42-61.3-1(g)(5), for his actions and there is no court precedence or facts that were presented here that would cause him to believe or understand that his conduct violated the plaintiff's constitutional rights.  Based on the plain language of § 42-61.3-1, a reasonable officer would not have known that a casino patron could not be interviewed in order to confirm  his/her correct name to be  recorded on a permanent ejection notice.  As provided for by R.I. Gen. Laws § 42-61.3-1(g)(6), Corporal Fevrier's actions were objectively reasonable and appropriate to carry out his duties and responsibilities; he is entitled to qualified immunity from Plaintiff's Fourth Amendment claim.

### ii. Corporal Fevrier Did Not Impermissibly Search Plaintiff In Violation of the Fourth Amendment

As the court does when reviewing a case to determine the lawfulness of a seizure, it will similarly look to "the totality of the circumstances to see whether the officer had a particularized, objective basis for his or her suspicion" for the search of a citizen.  *Estrada v. State of Rhode Island*, 594 F.3d 56, 66 (1st Cir. 2010).  Relying on *Terry v. Ohio*, 392 U.S. 1 (1968), courts have recognized that a police officer is not required to have "absolute certain[ty] that the individual is armed [prior to a search]; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or the safety of others was in danger."  *U.S. v. Steele*, 195 F.Supp. 2d 202, 207 (D.Me. 2002)(*quoting United States v. Taylor*, 162 F.3d 12, 17 (1st Cir. 1998).  However, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Steele*, 195 F.Supp 2d at 207 (*quoting United States v. Kimball*, 25 F.3d 1, 6 (1st Cir 1994)).  The court

will consider the totality of the circumstances.  *Id.*  And, in so doing, the court is mindful that "'it would be unreasonably to require that police officers take unnecessary risks in the performance of their duties."  *Id.*  While engaging in legitimate investigative conduct, "'the police may take reasonable steps to protect themselves by searching a suspect for weapons or taking other protective measures.'"  *Estrada,* 594 F.3d at 66 (quoting *United States v. Taylor,* 162 F.3d, 12, 17 (1st Cir.1998)); *see also Flowers v. Fiore,* 359 F.3d 24, 30 (1st Cir.2004).

Corporal Fevrier responded to Twin River Casino to meet Plaintiff and sign an ejection notice pursuant to R.I. Gen. Laws § 42-61.3-1; engaging in legitimate investigatory conduct. Corporal Fevrier entered the very small interview room at the casino (Diamant Dep. 87:22-88:14; Fevrier Dep. 35:13-19), to meet an individual that he was told had been ejected from Foxwoods Casino the prior night as a confirmed advantage player.  The individual was refusing to produce identification to Twin River Casino security in order from them to complete their intended ejection notice.  Before coming to the casino, Corporal Fevrier ran Plaintiff's presumed name and date of birth through the state control but the results came back "negative."  *Id.* at 30:2-7.  To Corporal Fevrier this meant that the person did not exist in the United States.  Added to this is the backdrop that as a member of the GEU, Corporal Fevrier had encountered patrons at Twin River Casino who he discovered were carrying small pocket knives.  *See* Exhibit G.  Given the totality of the circumstances, it was objectively reasonable for Corporal Fevrier for his safety to perform an unobtrusive pat down, remove the previously unknown waist wallet and open it to ensure that it did not contain weapons.  His  actions were conducted during the course of his duties as defined by R.I. Gen. Laws § 42-61.3-1.  At the very least, it cannot be said that a reasonable officer in Corporal Fevrier's position would have understood that his conduct violated Plaintiff's constitutional right. Accordingly, Corporal Fevrier is entitled to qualified immunity for the pat

down search under federal law.  *See Estrada*, 594 F.3d at 68.

### D.  Corporal Fevrier is Entitled to Judgement on Plaintiff's False Imprisonment Claim

   ***i.  Plaintiff's false imprisonment claim fails because Corporal Fevrier did not confine or intend to confine Plaintiff and any alleged confinement was privileged, pursuant to R.I. Gen. Laws § 42-61.3-1(g)(5)***

To establish a prima facie case for false imprisonment under Rhode Island law, a plaintiff must show that (1) the defendant intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; (4) the confinement was not otherwise privileged. *See Moody v. McElroy*, 513 A.2d 5, 7 (R.I. 1986) (citing 1 Restatement (Second) Torts § 35). The plaintiff must also "show that he … was detained without legal justification." *Beaudoin v. Levesque*, 697 A.2d 1065, 1067 (R.I. 1997). While the intent to confine is a necessary element of the tort of false imprisonment, *see Illas v. Przybyla*, 850 A.2d 937, 942 (R.I. 2004), malice is not an element of the tort of false imprisonment. *Beaudoin v. Levesque,* 697 A.2d 1065, 1067 (R.I. 1997) (*per curiam*).

Corporal Fevrier did not confine or intend to confine Plaintiff in the interview room. By the time Corporal Fevrier arrived at TWC, Plaintiff had already been waiting in the interview room for approximately ten (10) minutes. *See* Diamant Dep. 60:11-60:15. Corporal Fevrier did not command that Plaintiff be held or escorted to the interview room. Corporal Fevrier testified, that it was his "understanding that Lincoln Police as well as Twin River security were speaking with [Diamant] at the time" and that once he received a response from the State Police Situate barracks state control, Corporal Fevrier "called Twin River surveillance back and told them that I was coming. I was going to the casino." *See* Fevrier Dep. 32:03-32:17. The record here is utterly devoid of any evidence that Corporal Fevrier intended to confine Plaintiff or directed another to confine him. *Cf  Illas v. Przybyla*, 850 A.2d 937, 942 (R.I. 2004) (affirming the dismissal of a false

imprisonment claim against the Town of Scituate based on a lack of intent to imprison the plaintiff, where the alleged imprisonment was caused by a Warwick police officer and not a Scituate police officer).

Second, throughout the entirety of his discussion with Corporal Fevrier, Plaintiff was neither physically restrained nor forced to stay in the interview room. *See* Kyle Dep. 37:17-37:20; Anterni Dep. 30:06-30:09; Fevrier Dep. 40:1-41:20. At no point while Corporal Fevrier was present did Plaintiff rescind his consent or attempt to leave the room. Fevrier Dep. 40:4, 40:9-12. Although Plaintiff claims that he told Corporal Fevrier that he wanted to leave, there was nothing restricting Plaintiff from getting up and walking out of the interview room and exiting the casino— Plaintiff willingly remained in the room until the interview concluded and never once attempted to leave. *See* Diamant Dep. 50:15-55:7; Fevrier Depo 40:01-40.04. Moreover, at no point did Corporal Fevrier command Plaintiff to remain in the room or tell Plaintiff he was not allowed to leave. *See* Fevrier Depo 40:01-41:20. Plaintiff was never under any threat of physical violence nor was he obliged to stay in the room with Corporal Fevrier. *See* Fevrier Dep. 40:1-41:20. Plaintiff retained the option to leave. *See* Anterni Dep. 72:15-16, 74:8-13; *see also* Fevrier Dep. 40:1-41:20.

Third, even assuming *arguendo*, that Corporal Fevrier intended to have TWC detain Plaintiff, such a detention was privileged. *See Beaudoin v. Levesque,* 697 A.2d 1065, 1067 (R.I. 1997). Of the belief that Plaintiff's admitted card counting at the black jack table compromised the integrity of the casino game and having been advised that Plaintiff had been excluded from Foxwoods Casino the night before, Corporal Fevrier's actions are in accord with R.I. Gen. Laws § 42-61.3-1(g). *See* Diamant Depo 34:06-34:12. As discussed, *supra*, Corporal Fevrier testified that his purpose in going to TWC "was to issue an ejection notice based on [Diamant's] reputation and presence in the casino," pursuant to R.I. Gen. Laws § 42-61.3-1(g)(5), at the request of TWC.

*See* Dep. Fevrier 43:08-43:20. *Beaudoin*, 697 A.2d at 1067.  Corporal Fevrier was simply "there to get a name from [Diamant] to write on the ejection notice," in accordance with his duties as a member of the State Police gaming enforcement unit. *See* Dep. Fevrier 43:12-43:15; *see also Beaudoin*, 697 A.2d at 1067. Corporal Fevrier relied on R.I. Gen. Laws § 42-61.3-1(g). and, at a minimum is entitled to qualified immunity from this suit.

Therefore, Plaintiff's false imprisonment claim against Corporal Fevrier fails and must be dismissed.

ii.   ***Plaintiff's intentional infliction of emotional distress claim fails because Plaintiff did not suffer any physical symptomology***

Plaintiff's claim that Corporal Fevrier is liable for intentional infliction of emotional distress (Count II) fails as a matter of law. To succeed on a claim for intentional infliction of emotional distress, a plaintiff must show that: "(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress must be severe." *Swerdlick v. Koch*, 721 A.2d 849 864 (R.I. 1998) (adopting the standard set forth in Restatement (Second) of Torts § 46); *see also Champlin v. Washington Trust Co of Westerly,* 478 A.2d 985, 989 (R.I. 1984). The standard for extreme and outrageous conduct is extremely high as the plaintiff must prove that the defendant's conduct was beyond mere intent or even malice. *Swerdlick*, 721 A.2d at 863 ("the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."). Providing context to the first two elements, the Rhode Island Supreme Court has looked to the Restatement, which provides at comment (d):

It has not been enough that the defendant has acted with an intent which is tortious

or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.* Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

*Id.* at 873 (citing Restatement (Second) Torts, § 46 cmt. d) (*emphasis added*). To demonstrate that the emotional distress is severe, with respect to the fourth element, the plaintiff must also set forth sufficient evidence of medically established physical symptomatology. *Swerdlick*, 721 A.2d at 863.

It is beyond dispute that Corporal Fevrier's conduct towards Plaintiff cannot be described as extreme or outrageous. Corporal Fevrier's interaction with Plaintiff was limited to, at most a half an hour. During that time he conducted a cursory pat down for officer safety, removed an unseen waist wallet to ensure it did not contain a weapon, asked Plaintiff non-intrusive questions and signed the ejection notice prepared by Twin River Security.

Also, the record is vacant of any evidence of medically established physical symptomology. In fact, the Plaintiff states in his Answers to the State's Interrogatories that the basis for his alleged emotional distress is that "[b]eing intimately searched by the RI State detective, in front of casino personnel, was humiliating and degrading…." *See* Plaintiff Answer's to Fevrier's Interrogatories, No. 5, attached hereto as Exhibit H. Additionally, the Plaintiff admitted during his deposition that he did not have any physical symptomology and stated "I have no physical injury as a result of this" and that Plaintiff had "nothing in the way of treatment either psychological or medical as a result of [the] incident…." *See* Diamant Depo 23:02-23:04; 24:09-24:13. Not only does Plaintiff lack physical symptomology, when questioned about his claim of

23

emotional distress, Plaintiff testified "I don't have emotional distress today as a result of my experience." *See* Diamant Depo 23:16-23:20.

Plaintiff's own testimony makes it unequivocally clear that he did not suffer any physical symptomology and did not suffer severe emotional distress. Qualified immunity would also bar Plaintiff's claim.   Thus, Plaintiff's intentional infliction of emotional distress claim against Corporal Fevrier fails and must be dismissed.

### E.  **Plaintiff's Vicarious Liability Claim at Count Four Fails as a Matter of Law**

Plaintiff cannot sustain a claim of vicarious liability because: (1) Corporal Fevrier was served only in his official capacity; (2) Corporal Fevrier, even if named in his individual capacity, is entitled to qualified immunity and (3) there is not evidence that Corporal Fevrier engaged in unlawful activity that was in furtherance of a State policy. *See Ensey v. Culhane*, 727 A.2d 687 (R.I. 1999).  The facts supporting each of these arguments has been briefed at length herein.    As there is no individual wrong doing by a State employee, the State cannot be held vicariously liable. *See Morales v. Town of Johnston*, 895 A.2d 721, 728-29 (R.I. 2006).

Wherefore, Count Four should be denied and dismissed.


### **CONCLUSION**

For the foregoing reasons, as well as those that may be raised at hearing, the State respectfully requests that this Honorable Court grant the State's Motion for Summary Judgment and enter judgment in favor of the State pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

Respectfully Submitted,

Defendant
RHODE ISLAND STATE POLICE
CORPORAL LAWENS FEVRIER, in his
official capacity,
By:

PETER F. NERONHA
ATTORNEY GENERAL

/s/ Brenda D. Baum
/s/ Justin J. Sullivan
_____

Brenda D. Baum, Bar No. 5184
Assistant Attorney General
Justin J. Sullivan, Bar No. 9770
Special Assistant Attorney General
150 South Main St. Providence, RI 02903
Tel: (401) 274-4400 | Fax: (401) 222-2995
Ext. 2294 | bbaum@riag.ri.gov
Ext. 2007 | jjsullivan@riag.ri.gov

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on Monday, December 09, 2019 I electronically
filed the herein document via the ECF filing system and that a copy is available for viewing and
downloading. I also hereby certify that I caused a copy of the herein document to be served via
the ECF system to the following:

*Counsel for Plaintiff, Dan Diamant*        *Counsel for Defendant, UTGR (Twin River)*
Thomas G. Briody, Esq.                       Paul R. Crowell, Esq.
TBriodylaw@aol.com                           paul.crowell@zurichna.com

                                             *Counsel for Defendant, Town of Lincoln*
                                             Marc DeSisto, Esq.
                                             marc@desistolaw.com
                                             Kathleen A. Hilton, Esq.
                                             Katie@desistolaw.com


                                             */s/Justin J. Sullivan*
                                             _____

25