# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

**DAN DIAMANT**

        **v.**                                  **C.A. No. 1:17-cv-00548-JJM-PAS**

**UTGR, INC. d/b/a Twin River Casino**
**and John Does, various security personnel**
**Employed by Twin River Casino, as well as**
**Joseph Anterni and Russell Enos, police officers**
**employed by the Town of Lincoln,**
**Rhode Island, and Detective Trooper**
**Lawens Fevrier, Rhode Island State Police**

## UTGR, INC.'S MOTION IN LIMINE TO PRECLUDE EXAMINATION OF SECURITY OFFICERS REGARDING WHETHER CARD COUNTING IS A CRIME.

Plaintiff, Dan Diamant ("Plaintiff"), has filed a complaint against UTGR, Inc. ("UTGR"), the Town of Lincoln ("Town"), Town of Lincoln Police Officer Joseph Anterni and Russell Enos, the Rhode Island State Police, and Rhode Island State Police Trooper Lawens Fevrier ("Fevrier"). as result of an incident that occurred at Twin River Casino on July 2, 2016. Plaintiff's Complaint alleges two counts against the casino, *i.e.* "False Imprisonment" ("Count One") and "Intentional Infliction of Emotional Distress" ("Count Two").[1] In sum, the basis of plaintiff's claim is that he was falsely imprisoned and held against his will in order to force him to produce identification after he was determined to be "counting cards." Diamant alleges that he refused to produce identification because he did not want it disseminated to other casinos.

During depositions in this case, counsel for plaintiff inquired of UTGR security personal their opinions as to whether card counting was a crime. These questions however require a legal

---

[1] UTGR has a pending motion for summary judgment as to Count Two based on lack of medical symptomology and law of the case doctrine as this Court previously granted summary judgment to co-defendants on that claims.

opinion and are more appropriately addressed to the court. Furthermore, private security's subjective belief or opinions are irrelevant to the issues in dispute.

Accordingly, UTGR requests that this Court enter an Order precluding plaintiff counsel from asking UTGR's security personnel whether card counting was a crime, or whether they believed it was a crime.

I.    **BRIEF SUMMARY OF RELEVANT FACTS**

1.    UTGR, Inc., operates the Twin River casino in Rhode Island.

2.    R.I. General Laws §41-3-17 allows casinos discretion to refuse admission and/or object any person deemed "undesirable," which includes card counters or "Advantaged Players."

3.    On July 2, 2016, Diamant went to the Twin River to count cards while playing "Blackjack**."**

4.    Twin River had received a communication from Foxwoods Casino, with Plaintiff's name and date of birth, indicating that Plaintiff was a card counter and thus a "confirmed advantage player." Accordingly, the table games floor manager requested that security eject Mr. Diamant.

5.    Security was dispatched to issue an ejection at 6:39 p.m.

6.    Kyle radioed for Lincoln Police to witness the ejection. This is normal practice and procedure when issuing any ejection. *Deposition of James Kyle* (Mar. 8, 2019), p. 35:5-10. (Cited pages attached at **Exhibit 1**)

7.    Captain Kyle also had the on-call detective from the RI State Police Gaming Enforcement Unit (the "GEU") notified of the incident, because the GEU unit handles all potential gaming issues.

8.    Corporal Fevrier was advised that an individual at the casino was believed to be counting cards, refused to provide identification, and was being ejected as a confirmed advantage player. *Id.* at 16:11-14.

9.    Corporal Fevrier testified that he was asked "what the next step would be." *Deposition of Lawens Fevrier* (Jan. 16, 2019) at p. 29:12-18 (cited pages attached as **Exhibit 2**).

10.     Fevrier testified that he was not surprised that a card counting incident would be reported to the GEU "because the gaming enforcement unit handles all gaming matters at the casino, not Lincoln Police or Twin River security." *Id.* p. 70:16-71:5.[2]

11.     Fevrier made the decision to respond to the casino after Diamant's name did not come up in a search in "state control." *Id.*, p. 32.


## II..   <u>APPLICABLE LAW</u>

The threshold for admissibility of evidence is relevance. Rules 401 and 402 of the Federal Rules of Evidence establish the basic principle that relevant evidence is that which makes the existence of any fact "of consequence in determining the action" more or less probable. *FRE* 401. However, while "relevance" crosses the threshold, it must then pass through the corridor of materiality before it can fully enter the courtroom of admissibility. "In order to be legally relevant… an item of evidence has to have some extra bit of probative power sufficient to outweigh the costs of any untoward results of its admissibility." 22 Charles Alan Wright & Kenneth W. Graham, Jr., <u>Federal Practice and Procedure: Evidence</u>, § 5162 at 18 (1978). Rule 403 of the Federal Rules of Evidence plays an important role in that regard. Entitled "Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons," Rule 403 states that:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

*Fed. R. Evid. 403.*

---

[2] In 2013 the Rhode Island General Assembly enacted R.I. Gen. Laws § 42-61.3-1 directing the superintendent of the Rhode Island State Police ("RISP") to establish the "Gaming Enforcement Unit" ("GEU"). The GEU works "independently and in conjunction and cooperation with the division of state lottery and the department of business regulation to ensure the integrity of casino gaming activities in the state." R.I. Gen. Laws § 42-61.3-1(b). The GEU's statutorily enumerated duties give it exclusive jurisdiction over gaming infractions, including oversight of the "honesty and integrity of casino gaming activities."

**III.     ANALYSIS AND ARGUMENT**

**(a)     Whether Something Is A  Crime or Not Is a Question of Law Unsuitable for Witness Examination.**

Whether something is or is not a crime raises a question of law; and, in this case, one that requires interpretation of a statute.[3]  Such questions are reserved exclusively for the Court.  Even would-be "experts" cannot opine as to such matters.  *Bacchi v. Mass. Mut. Life Ins. Co.*, No. 12-cv-11280-DJC, 2016 U.S. Dist. LEXIS 37772, at \*7 (D. Mass. Mar. 23, 2016); *Roman-Roman v. Altieri*, 371 F. Supp. 2d 7, 10 (D.P.R. 2004). *See also U.S. v. Barsanti*, 943 F.2d 428, 432-433 (4th Cir. 1991)(proper to exclude expert testimony interpreting statutes); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995)(self-described expert in police practice should not have been permitted to render opinion that was a statement of legal conclusion); *Burkhart v. Washington Metro. Area Trans.Auth.*, 324 U.S. App. D.C. 241, 112 F.3d 1207, 1213 (D.C. Cir. 1997)""Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards"); *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) (affirming exclusion of expert testimony about meaning of statutes and regulations because "[t]he only legal expert in a federal courtroom is the judge"); *In re Initial Pub. Offering*

---

[3]     R.I. General Laws §42-61.3-2(a)(2) prohibits, *inter alia*, cheating in a casino.  The term "Cheat"

> to alter the element of chance, method of selection or criteria with determines:
>     (i) the result of the game;
>     (ii) The amount or frequency of payment in a game, including intentionally taking advantage of a
>         malfunctioning machine;
>     (iii) the value of a wagering instrument; or
>     (iv) the value of a wagering credit.

> In this regard, it is notable that Plaintiff Diamant testified that card counting is intended to increase the chances
> (i.e. alter the element of chance) of winning a game of blackjack.  *Deposition of Dan Diamant* (Dec. 7, 2018), at
> p. 68:16-24 & 83:27-24 (cited pages attached as **Exhibit 3**).

*Sec. Litig.*, 174 F. Supp. 2d 61, 63 (S.D.N.Y. 2001) ("there is no such thing as an expert opinion when it comes to interpreting a statute unless that opinion belongs to a court").

**(b)       Captain Kyle's Belief as to Whether Counting Cards Is a Crime Is Irrelevant.**

Captain Kyle's *belief,* one way or the other, that counting cards was a crime is irrelevant to the issues in dispute.  UTGR and its security officers have <u>not</u> testified that Diamant was being ejected because he committed crime, but only because he was counting cards. UTGR has the right to eject such persons *regardless* of whether card is a crime. *R.I. General Laws* §41-3-17.

Captain Kyle also did not testify that he called the on-detail Town Police to respond because he thought Diamant was committing a crime. Rather, UTGR security's practice is to have Lincoln Police Officers witness all permanent ejections so that the Town can prosecute a trespass action in the event a patron returns despite being ejected. This is true regardless of whether or crime was involved or not.

Finally, Captain Kyle's own belief as to whether counting cards was or was not a crime is irrelevant to the propriety of his informing the RISP GEU of a card counting ejection.  Fevrier testified that this was correct procedure "because the gaming enforcement unit handles all gaming matters at the casino, not Lincoln Police or Twin River security." In fact, Rhode Island General Laws vests the GEU with *broad* investigatory powers. (See <u>supra</u>., f.n. 2). It was neither the right nor the prerogative of private security to usurp this function.  Simply put, Captain Kyle was required by the RISP GEU to report any issues implicating the integrity of table games. It was then incumbent upon the GEU to determine whether a crime had been committed or whether or any action permitted by R.I. Gen. Laws § 42-61.3-1 was warranted.

To the extent that Captain Kyle's own belief as to whether card counting was a crime has any relevance – and UTGR can conceive of none – that hypothetical relevance is outweighed by the potential prejudicial effect of jury confusion. Simply allowing counsel to ask such questions – and presumably focus closing arguments on them – would have an impermissible effect of suggesting to a jury that Captain Kyle had some right to disregard his duty to report potential gaming infractions to the GEU based on his own statutory interpretations.[4]

**WHEREFORE**, UTGR requests that this Court enter an Order precluding plaintiff counsel from asking UTGR's security personnel whether card counting was a crime, or whether they believed it was a crime.

UTGR, Inc.,
By Its Attorney,

*/s/ Paul R. Crowell*

_____

Paul R. Crowell, Esq. (#6904)
Engelberg & Bratcher
100 High Street, Suite 1450
Boston, MA 02110
T: 617-371-4228
*paul.crowell@zurichna.com*

---

[4] This is no more correct than concluding that a witness to a murder could fail to report it based on his own belief as to whether the murderer acted in self-defense.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 20, 2020, I electronically filed the herein document via the ECF filing system and that a copy is available for viewing and downloading. I also hereby certify that I caused a copy of the herein document to be served via the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF)

_/s/_ Paul R. Crowell
Paul R. Crowell, Esq. (6904)

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


DAN DIAMANT                          :
                                     :
VS.                                  :
                                     : C. A. No.
UTGR, INC. d/b/a Twin River  : 1:17-cv-00548
Casino and John Does, various  JJM-PAS
security personnel employed  :
by Twin River Casino, as well:
as police officers employed  :
by the Town of Lincoln, Rhode:
Island, and Detective Trooper:
Lawens Fevrier, Rhode Island :
State Police                         :



        Deposition of JAMES F. KYLE, III, a Witness

herein, taken on behalf of the Plaintiff, on

MONDAY, MARCH 18, 2019, 2:55 P.M., at the offices

of THOMAS G. BRIODY, ESQUIRE, 128 Dorrance Street,

Providence, Rhode Island, before Vivian S.

Dafoulas, Registered Merit Reporter/Certified

Realtime Reporter.




                Vivian S. Dafoulas, RMR-CRR
                        P.O. Box 107
                East Greenwich, RI  02818
                    (401) 885-0992

1  an ejection form, I requested Lincoln Police,

2  which is our procedure.  Lincoln responds to

3  witness the ejection.

4      He'd -- he did not want to take and

5  produce -- he refused to produce identification,

6  and at that point I just waited until the Lincoln

7  officers got there.

8      Once the Lincoln officers got there, security

9  backs off, we step back, because at that point

10  there, the police are in charge of the situation.

11      Also during this period of time, I contacted

12  surveillance and asked that the on-call detective

13  from the Rhode Island State Police be notified and

14  to see whether or not he would be responding.

15      A period -- a very short period of time goes

16  by, the Lincoln officer is speaking with the

17  patron, and I remember checking once to see when

18  the Gaming Enforcement detective would be arriving

19  to get some kind of a time period here, and we

20  basically stood by all that time.

21      There was -- I know at one point Mr. Diamant,

22  I guess, began to start to walk away at which

23  point I was advised that the detective -- the

24  State Police detective had arrived, and at that

1    Q.    Okay.  So when you say they attempted to

2    get him to comply with producing identification

3    and he refused, you don't know that that's what

4    the conversation was about, do you?

5    A.    I do know that I requested Lincoln PD

6    because it is required whenever an ejection -- a

7    permanent ejection or any ejection is going to be

8    issued, okay?  And I know I would have told

9    Lincoln PD that he's refusing to produce

10   identification.

11   Q.    *While you were discussing this with

12   Mr. Diamant and while Lincoln was discussing

13   their --

14   A.    I --

15        MR. BRIODY:  You've got to let me finish

16   the question.  Can we stop for a second?

17        (Off-the-record discussion.)

18        MR. BRIODY:  I don't even remember what

19   I was going to ask.

20        (The *record was read by the court

21   reporter.)

22   BY MR. BRIODY:

23   Q.    While you were having this discussion

24   with Mr. Diamant, was he free to walk out of the

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


DAN DIAMANT                        :
                                   :
VS.                                :  C. A. No.
                                   :  1:17-cv-00548
UTGR, INC. d/b/a Twin River        :  JJM-PAS
Casino and John Does, various      :
security personnel employed        :
by Twin River Casino, as well      :
as police officers employed        :
by the Town of Lincoln, Rhode      :
Island, and Detective Trooper      :
Lawens Fevrier, Rhode Island       :
State Police                       :


         Deposition of TROOPER LAWENS FEVRIER, a

Defendant herein, taken on behalf of the Plaintiff

on Wednesday, January 16, 2019, 2:00 P.M., at the

offices of THOMAS G. BRIODY, ESQUIRE, 128 Dorrance

Street, Providence, Rhode Island, before Barbara J.

Vican, Professional Court Reporter.




         Vivian S. Dafoulas & Associates
                  P.O. Box 107
            East Greenwich, RI 02818
                (401)885-0992

1  receive a telephone call or some kind of

2  notification?

3      A.    I did, sir.

4      Q.    What was that?

5      A.    At approximately 6:30 p.m. I received a

6  telephone call from the Twin River Casino

7  surveillance department.

8      Q.    Do you remember who you spoke with?

9      A.    I do not.

10     Q.    As best you can recall, what were you

11 told?

12     A.    I was advised that they had a person with

13 a possible name of Dan Diamant who was playing at a

14 blackjack table at Twin River Casino and who was

15 kicked out or ejected from Foxwoods Casino on the

16 day before or two days prior, and he was currently

17 at Twin River Casino, and they wanted to know what

18 the next step would be.

19     Q.    What the next step would be?

20     A.    Correct.

21     Q.    Okay.  What did you say?

22     A.    I told whoever I spoke with to give me the

23 name and his date of birth and I would run his

24 information through our state control.

1  control," do you mean the barracks in Situate?

2    A.    Correct.

3    Q.    What was your understanding of where

4  Mr. Diamant was while you were engaged in this

5  process?

6    A.    It was my understanding that Lincoln

7  Police as well as Twin River security were speaking

8  with him at the time.

9    Q.    Okay.  So that was going on while you were

10 trying to run this information?

11   A.    Yes, sir.

12   Q.    When you received your response from the

13 Situate state control barracks, unit, what did you

14 do?

15   A.    I called Twin River surveillance back and

16 told them that I was coming.  I was going to go to

17 the casino.

18   Q.    Okay.  So about what time did you leave

19 your house?

20   A.    Approximately 6:40.

21   Q.    Okay.  About ten minutes after you got the

22 first call?

23   A.    Yes, sir.

24   Q.    Okay.  And I believe you testified that in

1 unit handles all gaming matters at the casino, not

2 Lincoln Police or Twin River security.

3     Q.   Does that include matters that do not

4 involve unlawful activity?

5     A.   Correct.

6     Q.   What other types of lawful activity do you

7 investigate at the casino?

8     A.   Sure.  Someone who is -- who might not

9 want to play at the casino anymore and they want an

10 ejection notice at times, and Twin River would

11 write it and we would sign on it.

12     Q.   Would you come back from your home after

13 having worked all day simply for an ejection?

14     A.   Any ejection?

15     Q.   Yes.

16     A.   Yes.

17     Q.   You would?

18     A.   Correct.

19     Q.   Well, I believe you testified earlier that

20 your presence or your signature on an ejection

21 notice is not necessary to confirm the ejection; is

22 that right?

23     A.   Based on what they have going on at times,

24 when Twin River security want to eject someone,

1 Lincoln Police can actually sign it or any law

2 enforcement can sign it.  So they don't need me

3 there to sign it.

4      Based on the fact that I got the call of a

5 gaming matter, then I would have to respond to sign

6 it.

7      Q.   Okay.  So is it your testimony that you're

8 the only -- or that a state trooper is the only

9 person who can sign an ejection for a gaming

10 matter?

11      A.   If it's gaming related where the trooper

12 or detective is called and the trooper responds or

13 detectives respond to the case, then he would be

14 the only one to sign it.

15      Q.   Okay.  So if I understand you correctly,

16 when you were on that shift -- and I know you don't

17 even do this anymore -- but if you got a call from

18 Twin River saying, "We need you to come back here,"

19 you felt it was incumbent upon you at that point to

20 go; is that correct?

21      A.   It was my decision to go.  They didn't

22 need me to go back there based on the circumstance.

23 Based on the facts that I had, then I wanted to

24 make sure that I had the right information to write

# EXHIBIT 3

```
 1                   UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF RHODE ISLAND
 2


 3    DAN DIAMANT

 4          VS                        C.A. NO. 17-548-JJM-PAS

 5    UTGR, Inc.d/b/a Twin River Casino and
      John Does, various security personnel
 6    employed by Twin River Casino; as well as
      police officers employed by the Town of
 7    Lincoln, Rhode Island and Detective Trooper
      Lawens Fevrier, Rhode Island State Police
 8    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 9                     D-E-P-O-S-I-T-I-O-N

10       DEPOSITION of Dan Diamant, taken in the above-entitled

11    cause on behalf of the Defendants, pursuant to notice,

12    before Brenda A. Scharver, Notary Public in and for the

13    State of Rhode Island, at the offices of DeSisto Law, 60

14    Ship Street, Providence, Rhode Island on December 7, 2018

15    scheduled for 1:00 p.m.

16

17

18

19

20

21

22

23

24
```

1   A   That will do.

2   Q   So your first two cards say you got an 18?

3   A   Yes.

4   Q   Now you don't want more than a 3 card if you take a hit;

5       correct?

6   A   I'm not sure what the question is.

7   Q   You want to get up to 21; correct?

8   A   You want to get up to 21, that's correct.

9   Q   So if you hit on an 18 and you get a 3 card, you have 21;

10      right?

11   A   That's correct.

12   Q   And you have won your hand?

13   A   You have to wait for the dealer to play.

14   Q   And how can the dealer beat you?

15   A   If he gets 21, then it's a push.  It's not a win.

16   Q   If you're not counting cards, whenever you decide to take

17      a hit you're relying upon the randomness of the deck?

18   A   Well, everyone who plays blackjack makes decisions their

19      own way.  Some people just guess.  Some people use

20      strategy.

21   Q   Your strategy is to count cards?

22   A   I count cards.

23   Q   And you believe that by doing that it increases your

24      chances of winning?

| | | |
|---|---|---|
| 1 | | know whether casinos keep a closer watch on someone they |
| 2 | | consider an advantage player? |
| 3 | A | Yes, they do. |
| 4 | Q | Because that person may win a lot of money? |
| 5 | A | They may do, they may not do. |
| 6 | Q | It depends on how well they do that day? |
| 7 | A | It depends on luck. |
| 8 | Q | When you're playing blackjack are you playing against |
| 9 | | other people? |
| 10 | A | No, you play against the dealer. |
| 11 | Q | But there are other people at the table? |
| 12 | A | There are other people at the table. |
| 13 | Q | And can more than one person win in blackjack? |
| 14 | A | Yes, more than one person can win. |
| 15 | Q | If they get the same number of cards up to 21? |
| 16 | A | Every person plays separately against the dealer. |
| 17 | Q | So by card counting you're trying to improve your odds |
| 18 | | against the dealer, not against other players at the |
| 19 | | table? |
| 20 | A | That's correct, you're trying to improve your odds |
| 21 | | against the dealer. |
| 22 | Q | But by virtue of you having this skill versus somebody |
| 23 | | not having this skill, it would put you at an advantage? |
| 24 | A | It would mean that I have a greater chance of winning |